UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| BILL JONES et al., on behalf of themselves and all others similarly situated,<br><br>　　　　　　　　*Plaintiffs*,<br>　　vs.<br><br>NEW ORLEANS REGIONAL PHYSICIAN HOSPITAL ORGANIZATION, INC., DBA PEOPLES HEALTH NETWORK,<br><br>　　　　　　　　*Defendant*. | CIVIL ACTION<br><br>NO. 17-8817<br><br>JUDGE ZAINEY<br><br>MAGISTRATE JUDGE DOUGLAS |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

For the following reasons, the Court should dismiss Plaintiffs' Fair Labor Standards Act ("FLSA") claims and Jones' Louisiana Wage Payment Act ("LWPA") claim or, alternatively, find that (1) the FLSA's two-year statute of limitations applies, (2) Plaintiffs cannot recover liquidated damages; and (3) the fluctuating workweek method is appropriate to compute Plaintiffs' damages.

### I.   UNDISPUTED FACTS MATERIAL TO THIS MOTION.

#### a.   The nature of Peoples Health's business.

New Orleans Regional Physician Hospital Organization, Inc. d/b/a Peoples Health Network ("Peoples Health") is a managed care company. *Thompson at ¶4.*  It offers an insurance product to individuals eligible for Medicare, known as a Medicare Advantage plan. *Id.* It administers the plan pursuant to a contract with the Center for Medicare and Medicaid Services ("CMS").  *Id.*

Peoples Health members receive healthcare and prescription drug benefits. *Id. at ¶5.* When members receive covered healthcare services, Peoples Health is obligated to pay the

providers for those services. *Id.* When members fill prescriptions for drugs covered by its plan, Peoples Health is obligated to pay the pharmacy for those drugs and then determine its entitlement to compensation from CMS for that prescription drug event. *Id.* To do business, Peoples Health must have a network of providers who are qualified and willing to provide healthcare services to its members. *Id. at ¶6.*

### b. The Network Development Department.

Within Peoples Health, there is a Network Development Department responsible for establishing and maintaining a network of healthcare providers to deliver services to Peoples Health's members and employees, including physicians and hospitals, as well as providers of ancillary services, such as transportation, home healthcare, physical therapy, and the like. *Id. at ¶14*; *Romero 31:5-11; Branch 26:16-27:6.* In the Network Development Department, there are sub-departments, including Provider Contracting and Operations. *Thompson at ¶15 and Ex. A1.*

Plaintiffs Bill Jones, Melissa Breaux, Ivette Perez, and Nan Nicole Crowder worked in Provider Contracting and were responsible for contracting with physicians and hospital-based providers who wished to join Peoples Health's network. *Id. at ¶18a.* Plaintiff Connie Hall[1] works in Provider Contracting as the Manager of Ancillary Contracting, and is responsible for contracting with ancillary service providers and supervising others to do so. *Id. at ¶18b.* Plaintiff Jennifer Branch worked in Operations as an Operations Specialist and was responsible for working on various projects designed to improve operational processes and efficiencies. *Id. at ¶18c.*

### c. The Pharmacy Department.

Peoples Health's Pharmacy Department is responsible for, among other things, ensuring that Peoples Health pays pharmacies when members fill prescriptions and determining whether

---

[1] Connie Hall also goes by the name Connie Rodi.

Peoples Health is entitled to compensation for those prescription drug events.  *Id. at ¶19.*  Within the Pharmacy Department, there are two sub-departments: Pharmacy Operations and Clinical Pharmacy Services.  *Id. at ¶20.*  The only plaintiff to work in the Pharmacy Department was Laura Romero.  *Id. at ¶21.*  At all times relevant to this lawsuit, she worked as the Pharmacy Part D Specialist in Pharmacy Operations and reported to Sean Kennedy, the Director of Pharmacy Operations.  *Id.*

### d.  The Human Resources Department.

Before UnitedHealthcare, Inc. ("UHC") acquired ownership of Peoples Health in 2018,[2] Peoples Health had a Human Resources department ("HR Department") that, among other things, was responsible for classifying each job position in the company as either exempt or non-exempt from the FLSA's overtime requirements.  *Id. at ¶24.*  To do so, it reviewed employee job descriptions to determine whether an employee's job duties and compensation qualified him or her for an FLSA exemption.  *Id.*  Because Peoples Health used employee job descriptions to classify positions, it took steps to ensure that those job descriptions accurately described employees' job duties.  Specifically, as part of the annual performance evaluation process, employees received copies of their job descriptions and were asked to make the following attestation:

**I. Review of Job Description**

The employee and supervisor have had an opportunity to review the employee's job description to ensure there is a mutual understanding of job responsibilities. The job description has been updated to reflect all changes that have occurred since the last evaluation. A signed and updated copy of the job description is included with this evaluation.

Supervisor's Initials_____     Employee's Initials_____

*Id. at ¶25.*

---

[2] UnitedHealthcare, Inc. acquired ownership of Peoples Health in 2018.  *Thompson at ¶8.*  However, Peoples Health classified all Plaintiffs as exempt from the FLSA's overtime requirements before the acquisition.

To attempt to ensure that Peoples Health's managers and employees complied with the requirement that they review and make any necessary changes to employee job descriptions, Peoples Health maintained a written Performance Appraisal Process policy setting forth this requirement, trained managers regarding the policy, and communicated with managers and employees about the policy. *Id. at ¶26 and Ex. A6.*

In addition to considering whether there was a need to change an employee's exempt status when he or she reported a change in job duties or a need to revise a job description, Peoples Health considered whether such a change was warranted when employees were transferred from position to position and promoted. *Id. at ¶27.* For instance, Peoples Health initially classified Branch and Romero as non-exempt, but changed their status to exempt when it promoted them. *Id.*

The HR Department also maintained and sought to ensure compliance with Workforce Classifications, Timekeeping, and Overtime policies, which were made available to Peoples Health's employees and, among other things, explained that Peoples Health would pay exempt employees on a salary basis; they would not receive overtime pay; and generally they would "receive the same weekly salary regardless of hours worked." *Id. at ¶23 and Exs. A4, A7, and A8.*

### e. Plaintiffs' job duties and classifications.

At all times relevant to this lawsuit, Peoples Health paid Plaintiffs on a salary basis of more than $445 per week and classified them as exempt. *Id. at ¶37.* Consistent with Peoples Health's policies, a number of the plaintiffs admitted they understood that Peoples Health would pay them the same fixed amount each week regardless of the number of hours they worked. *Hall*

4

21:6-11, 21:21-22:2, 53:5-21;[3] *Perez 15:8-15*;[4] *Breaux 18:6-13*.  Peoples Health's HR

Department has no record of Plaintiffs ever complaining that it misclassified them or failed to

pay them overtime before they filed this lawsuit.  *Thompson at ¶38.*  A description of each of the

plaintiff's primary job duties is below.

### i.   The Contracting Specialists: Jones, Breaux, Perez and Crowder.

Jones, Breaux, Perez, and Crowder all worked as Contracting Specialists and earned

between $56,000 and $67,000 per year.[5]  *Thompson at ¶37.*  In moving to conditionally certify

this case as a collective action, Jones explained that "he performed the same or similar jobs as

the other individuals who held the position of Contracting Specialist." *Doc. 28-1 at p. 4*.  The

only difference he identified was that he "focused on hospitals, rather than other groups like

individual physicians, physicians' assistants, or pharmacies."  *Id*.

As the record evidence shows, Peoples Health hired Jones in 2013 to work as a

Contracting Specialist recruiting hospital-based physicians who worked in emergency medicine,

radiology, anesthesiology, and pathology (known as "ERAP" providers) to join its network.

*Jones I 18:24-20*; *46:19-15*.  Jones remained employed by Peoples Health until May 10, 2017

and during his entire tenure with the company, his job duties remained generally the same.  *Jones*

*I 48:24-49:9*.  In his discovery responses, Jones described his primary duties as a Contracting

Specialist as follows:

---

[3] Hall testified that she understood at the time Peoples Health promoted her to Sr. Ancillary Contracting Specialist that her "salary was to compensate [her] for all the hours that [she] worked in any week."  *Hall 53:8-11*.  She also admitted understanding that she was "not going to be paid extra money if [she] had to work more than 40 hours a week when [she was] promoted to this senior ancillary contracting position."  *Hall 53:1521*.

[4] In her deposition, Perez testified that "Exempt is, I mean, salary.  You work hours. Like a certain number.  It doesn't matter how many hours you work.  You are going to get paid the same." *Perez 15:8-11*.  She admitted when Peoples Health hired her, she "understood that was going to be the deal" and that she was "going to receive the same amount of money each week regardless of how many hours [she] worked." *Id. 15:17-25*.

[5] On the day they separated from employment with Peoples Health (or in Nicole Crowder's case, United Health), Bill Jones was earning an annual salary of $64,567.42; Melissa Breaux was earning an annual salary of $56,446.27; Ivette Perez was earning an annual salary of $65,033.85; and Nicole Crowder was earning an annual salary of $67,204.80. *Thompson at ¶37*.

> As a Contracting Specialist, Jones was a contractor for hospital based ERAPS and identified and contacted physicians and physician groups and established relationships in order to facilitate the contracting process in accordance with departmental policies and procedures, was responsible for updating ProviderTrak, and participated in special projects (service area expansions).  The Contracting Specialist duties are considered office or non-manual work.  *Jones Disc. at Int. 8*.

As Jones testified, it was his "job to come in and build that network [the ERAP network] throughout the company."  *Jones II 35:21-36:13*.  When describing his day-to-day responsibilities, Jones explained that he would research to identify hospitals that might want to become contracted Peoples Health's network providers and then reach out to them to discuss the opportunity.  *Jones II 46:12-47:20*.  When the "situation dictated," he "would make arrangements to meet with people to try to build a relationship, you know, to educate them, be able to build a relationship to allow me to even gain access a lot of times to the right people to explain Peoples Health to them and why it mattered to us for them to join it."  *Id. 51:5-11*.  Once a provider expressed interest in joining the network, someone other than Jones would prepare a contract and he would facilitate the communications with the provider to have it executed.  *Jones II 51:13-24; Jones I 59:2-70:25.*

As Jones explained his role contracting with ERAPs in particular:

> This was new to Peoples Health.  They had never, at least to this degree, put anyone in the position to contract those physicians full time. I think they had somebody very briefly, who I don't think did much.
> So I did that.  And I came in and **built the entire network** and the hospital providers with few exceptions.
> Breaking down the numbers of them and the list by hospital, **almost every one of them, I contracted myself**.  **I found them**, **I built the relationships**, and **I got them to contract** with Peoples Health.  *Jones II 52:21-53:8*. [Emphasis added.]

Jones explained that often providers were not initially interested in contracting with Peoples Health, but he did not take "no" for an answer.  Instead, he worked to build a relationship with them until he could secure their agreement.  As Jones explained:

I would – it was my job to contract with them.  And I would – I mean, you don't stop when you hear "No," or nothing gets done.  So I would continue to work with them to build a relationship.  *Jones II 55:13-17*.

In connection with one of his annual performance evaluations, Jones prepared a document intended to "reflect that [he] was working and doing what [he] considered to be [his] job" and to describe what he had been doing that he thought warranted a pay raise.  *Jones I 150:16-152:10 and Ex. 11*.  Among other things, Jones wrote that he had:

- "[E]stablished a relationship with Internal Medicine provider Eric Melancon, MD, in Morgan City, LA" and that he was "able to successfully negotiate an agreement bringing him into Peoples Health Network."  *Jones at Ex. 11*.  Jones explained that he did this through "**thoughtful well-planned strategy**, the ability to rapidly **build strong relationships** and by **establishing credibility and trust** with Dr. Melancon" and others.  *Id*. [Emphasis added.]
- Established Children's Hospital as an in-network provider after three years of work on that initiative.  Jones wrote that he achieved this through "successfully build[ing] relationship and communications."  *Id*.
- Successfully contracted with the Schumacher Group "after three years of very intense determination and with extreme focus and dedication…"  *Id*.

Jones described his job similarly in his annual self-evaluations, the content of which he acknowledges is accurate.  *Jones I 152:11:153:12 and Ex. 12, 162:4-12 and Ex. 14, and 165:13-169:5 and Ex. 17, and 169:19-171:12 and Ex. 19*.[6]

Jones also described the process that he, and other Contracting Specialists, would follow to identify and contract with providers.  *Jones I 59:2-68:22*.  It involved: identifying a provider; researching them; contacting them; obtaining a verbal sign of interest; sending them a proposed contract; obtaining written confirmation of their interest; preparing materials for Peoples Health's contracts committee with a recommendation as to whether it should approve the

---

[6] In these self-evaluations, Jones identified his ability to "build fast, strong relationships with physicians, hospital administrators and their teams" as a strength.  *Jones I at Ex. 12 and 13*.  He noted that he "was part of the team responsible for establishing a network of providers to gain CMS approval for statewide expansion."  *Jones I at Ex. 13*.  He took credit for "gain[ing] key agreements" for Peoples Health and for "manag[ing] the growth and maintenance of three markets."  *Jones I at Ex. 17 and 19*.

provider; and obtaining a signed contract with any providers approved by the committee for contracting.  *Id*.

The deposition testimony and discovery responses provided by Breaux, Perez, and Crowder—the other Contracting Specialists who consented to join this collective action—is consistent with Jones'.  In written discovery, Crowder and Breaux both described their primary job duties as "contact[ing] physicians to try to recruit them to participate in PHN's network." *Breaux Disc. at Int. 6; Crowder Disc. at Int. 6*.  Likewise, Perez testified that during the "whole time" she worked for Peoples Health, her "primary job responsibility" was "identifying providers" in new markets and "recruiting them to join the Peoples Health network."  *Perez 23:19-24:1*.  Hunt Graham supervised Jones, Breaux, Perez, and Crowder at all relevant times. *Graham 47:7-17*.

Like Jones, Breaux and Perez worked on Peoples Health's effort to expand its operations statewide by identifying physicians in new markets and recruiting them to join Peoples Health's network.  *Breaux. 31:1-34:19; Perez 17:25-18:5*.  As Breaux explained, this involved "help[ing] with deficiencies," "traveling looking for, you know, providers to fill those spots where we had deficiencies," and doing "prep to submit things to go to committee."  *Breaux 33:8-25*.  Similarly, Perez explained that "as Peoples Health was expanding, it was looking at where it had physicians who were already part of network and where it needed physicians to join the network" because "it needed to have an adequate network in order to be able to enter a market."  *Perez 24:24-25:20*.  Peoples Health would let the Contracting Specialists know where it had deficiencies in its network and their job involved trying to find providers to contact in those areas and meeting with them to "sell them on the benefit of" joining the network. *Perez 25:8-20 and 25:25-26:17*.

With respect to helping with deficiencies, the Contracting Specialists were required to "research[] providers in different areas" and then "com[e] up with a plan" with their supervisor as to "who we were going to target." *Breaux 35:14-36:5, 40:4-42:16*. Breaux's market was the southeast part of Louisiana, but she testified that she "did the whole rest of the state," too. *Breaux 36:6-12*. Whereas, Perez testified that she initially focused on recruiting providers in North Louisiana to join the network, but when that proved difficult because of their unfamiliarity with Peoples Health, she focused her efforts on the Lafayette area. *Perez 19:4-12.*

As Jones explained, and as Breaux acknowledged, the Contracting Specialists usually were the "primary point of contact" with providers for contracting discussions. *Breaux at 48:3-8; Jones I 98:19-99:3*. When they traveled, the Contracting Specialists typically met with providers alone. *Breaux 55:19-60:12; Perez 22:18-21*. They would determine which providers to meet with based on their judgment of their level of interest in joining the network. *Perez 28:11-29:2*.

After targeting a provider and gathering information about them, the Contracting Specialists would prepare a "cover sheet" including a recommendation as to whether Peoples Health should approve the provider joining its network. *Breaux 44:2-46:2*. As Perez explained, it was her "responsibility to collect information about [the provider's] practice and other information to make a recommendation to the contracting committee as to whether to have [that] particular provider or group join the network." *Perez 29:17-24*. The Contracting Specialists would discuss their recommendations with their supervisors who also would give input before making a recommendation to Peoples Health's contracts committee. *Breaux 44:2-46:2; Perez 30:5-18*. Once the contracts committee approved a contract with the provider, the Contracting Specialists facilitated the communications to put the contract in place. *Jones I 67:13-69:20*.

9

### ii. Manager of Ancillary Contracting: Hall.

Peoples Health hired Connie Hall to perform ancillary services contracting. *Hall 25:15-17*. Hall advanced within the company and Peoples Health promoted her from Contracting Specialist to Sr. Contracting Specialist and, ultimately, to Manager of Ancillary Contracting, which is the position she holds presently and held at all times pertinent to this lawsuit. *Id. 52:23-53:4, 64:6-7, 65:17-21*. As the Manager of Ancillary Contracting, Hall's annual salary is $95,799.22. *Thompson at ¶37*.

When Peoples Health promoted Hall, she received management training, including training on the process for evaluating employees' performance. *Id. 83:9-84:15*. In her managerial role, Hall supervises two employees: a Contracting Specialist and a Contracting Coordinator. *Id. 80:15-81:13*; *Thompson at ¶18b*. Hall works with the employees she supervises "daily" and sits with them "on a very routine basis just to keep them in the loop or try to make sure they are educated on [Peoples Health's] contracts and the things like that." *Hall 74:5-20*. In addition to working closely with her subordinate employees and providing them with information needed to perform their job, Hall evaluates their performance on an annual basis. *Id. 88:8-89:1*; *Thompson at ¶18b*. In doing so, she rates them and understands that her ratings have a direct impact on their compensation. *Hall 88:8-89:1*. Although Hall has not had occasion to take disciplinary action against the employees she supervises, she understands that she has responsibilities in that regard and can make recommendations to her immediate supervisor about how to handle employee performance problems. *Id. 76:4-79:22*.

Hall also participates in interviewing new applicants for hire and admits that she has made recommendations to transfer and promote employees, which have been accepted, even over her immediate supervisor's objection. *Id. 134:11-24* (Hall attended the interview of Teree

10

Pennartz), *136:5-140:9* (Janice Ortego accepted Hall's recommendation to transfer Gina Austin over Anthony Bonck's objection), *141:8-144:8* (Hall supported Jennifer Nuss' request for a job transfer), *and 144:18-146:3* (Hall interviewed Amy Dinette and recommended her for hire).

In addition to supervising other members of the Network Development Department responsible for contracting providers of ancillary services, Hall performs contracting-related work herself. Unlike the other Contracting Specialists, Hall claims that she infrequently identifies new providers to join Peoples Health's network. *Id. 69:2-70:4; 100:14-101:22*. Instead, she typically receives and responds to letters from providers expressing interest in joining Peoples Health's network or requesting approval to provide additional services to Peoples Health's members. *Id.* Upon receiving such a request, Hall will gather information relating to it, formulate a recommendation, and attend the contracts committee meeting to present the recommendation and answer any questions. *Id. 36:20-22, 37:23-38:19, 39:20-40:1, 179:21-180:1; 180:8-16.* Hall admits that she is the "subject-matter expert" at Peoples Health on contracting for ancillary services and is the only ancillary services manager who attends the contracts committee meetings. *Id. 180:22-25*. Hall also admits that the contracts committee sometime agrees with her recommendations with respect to contracting for such services. *Id. 38:20:22.* Hall has the authority to negotiate rates with providers as long as the rate she negotiates is less than one hundred percent of the rate payable by CMS and admits that she has exercised that authority. *Id. 43:7-18*. Hall confirmed that her interactions with her immediate supervisor are "very minimal." *Id. 55:18-20*.

Unlike the other Contracting Specialists, Hall also performs some responsibilities that the Provider Relations Department typically handles. *Id. 124:11-125:23.* The Provider Relations Department typically interfaces with, liaises with, educates, and troubleshoots problems that

providers experience after they contract with Peoples Health. *Id.* In this regard, Hall testified that for approximately 50 ancillary service providers that operate nationally she would work "with those providers when they had any types of issues that they reported from claims to authorizations, or any appeals that they needed to get updates on, or any amendments that needed to be done. Anything." *Id. and 126:12-18.*

### iii. Operations Specialist: Branch.

Branch started working for Peoples Health handling Provider Relations Support for the Network Development Department on March 20, 2006. *Branch 25:8-22*. Shortly thereafter, Peoples Health promoted her to Network Development Project Coordinator. *Id. 27:7-28:9*. By 2009, Branch's job title had changed again to Network Development Project Manager. *Id. 29:11-18.* In that role, she "worked alongside of different teams with the Network Development Department" and earned more than $50,000 a year. *Branch 31:14-15; Thompson at ¶37.* She would "sit with people and listen to their overview of their position, how they did things, and look for opportunities." *Id. 31:19-22.* When management identified an issue that needed to be resolved, she was the "point person to work with the departments and whoever those subject matter experts were in the department to figure out how we were going to meet the need." *Id. 32:25-33:3.*

Branch assumed the Operations Specialist job title for the first time in 2011. *Id. 41:11-25.* Although her job title changed, Branch testified that "nothing changed at all" and her "role stayed the same" as it had when she served as the Network Development Project Manager. *Id. 41:1-11.* Branch remained in the Operations Specialist role from 2011 until June 13, 2016. *Id. 52:3-6.* Throughout that time, her job duties remained generally the same. *Id. 52:11-14.*

Meg Courtney, Branch's supervisor, testified that Branch's Operations Specialist job was project-based and that her primary role was to work on projects designed to improve processes and increase efficiencies.  *Courtney 17:21-18:2.*  In this regard, Courtney testified that the functions of an operations specialist were to "identify areas of improvement, work with five different subgroups to develop improvements and efficiencies along the way in terms of work processes amongst our subdepartments in network development and within other departments throughout the company." *Id. 11:12-22*.  Consistent with this, Branch described her "primary role" as Operations Specialist as "maintain[ing] relationships with all areas in Network Development" and "liais[ing] with those departments and the staff within those departments." *Branch 74:11-19*.  In her discovery responses, Branch described her "primary duties" as follows:

> The Operations Specialist position is a mix of recurring tasks and responsibilities to support assigned Network Development sub-departments with needs, as they arise.  The scope of the position was generalized to: supporting and meeting with the assigned Network Development sub-departments and their teams, reviewing current activity and **assessing need**, **making recommendations to change** current **processes** or **creating new processes**, **creating strategies** to remediate need, and executing approved strategies under the direction of the sub-department managers, the Network Development Operations Manager, and the Senior Vice President of Network Development. The Operations Specialist's duties are considered office or non-manual work. *Branch Disc. at Int. No. 8.* [Emphasis added.]

Branch's role required her to identify procedural deficiencies and then "decide if it was something we could change." *Id. 77:21-78:16*.  Branch admits that she would take it upon herself to recommend solutions to her immediate supervisor to problems she identified. *Id. 80:21-81:6*.  She admits that she "absolutely" made recommendations to management that were accepted and that Peoples Health implemented some of her recommendations. *Id. 83:9-12 and 81:13-16*.  Once management accepted those recommendations, Branch was responsible for training others on the newly implemented processes and procedures. *Id. 83:20-25*.

One project that Branch spent significant time working on was the re-write of the
specifications of Peoples Health's proprietary software system, ProviderTrak.  ProviderTrak is a
software system designed to automate the process relating to contracting providers. *Id. 118:16-
18*.  Initially, ProviderTrak did not serve its purpose.  *Id. 121:13-16*.  Peoples Health assigned
Branch to work with another employee, Michelle Menough, to improve the software by making
it something effective and efficient.  *Id. 121:17-24*.  This task involved "streamlining" processes
to "reduce the time" it took to contract a provider by "removing the inefficiencies."  *Id. 121:24-
126:18*.

Other projects Branch worked on to improve efficiencies and streamline processes
included developing a Provider Relations database and abbreviating the process for creating
Health Service Delivery tables.  *Id. 136:15-25, 180:18-181:25*.  Branch conceived of the "idea"
to create a Provider Relations database shortly after she joined Peoples Health "because of a
need that [she] saw working with the Provider Relations Department."  *Id. 137:9-11*.  The
purpose of the database was to enable Peoples Health to track its communications with providers
after it contracted with them.  However, "it never got off the ground."  *Id. at 139:14-17*.  Meg
Courtney "revived it" in 2014.  Thereafter, Branch worked on it and her work "was the exact
same as the ProviderTrak rewrite.  It just had a much smaller footprint."  *Id. at 142:10-143:12*.

In addition to the foregoing projects, Branch had responsibilities relating to assisting
Peoples Health with its efforts to evaluate the adequacy of its provider network.  Specifically,
Branch used the GeoNetworks and Quest software systems to enable Peoples Health to analyze
the adequacy of its provider network and to identify any deficiencies.  *Id. at 104:13-114-25*.
Twice a year, she would create Health Service Delivery ("HSD") tables, which reflected
information about network adequacy, for Peoples Health to supply to CMS.  *Id. at 104:13-114-*

*25*.  Additionally, as Peoples Health sought to expand its membership statewide, she would use the software to help analyze the adequacy of Peoples Health's network in specific markets throughout the state.  *Id*.

### iv.  Pharmacy Part D Specialist: Romero.

Romero started working for Peoples Health in March 2005.  *Romero 32:22-25*.  From 2005 to 2012, she held a number of different jobs in the Network Development, Pharmacy, and Compliance Departments, and Peoples Health promoted her multiple times.  *Thompson at ¶21*. In October 2012, Sean Kennedy, the Director of Pharmacy Operations, created a new position called Pharmacy Part D Specialist.  *Romero 105:14-106:11*.  Romero applied for and received the job.  *Id*.  She held it from January 25, 2013 until she resigned from Peoples Health on May 22, 2019, at which time she was earning more than $65,000 a year.  *Id. 108:17-109:1; Thompson at ¶¶21, 37*.

Romero's primary responsibility as a Pharmacy Part D Specialist was handling and resolving prescription drug events, or PDEs.  *Id*. 188:21-24.  When a Peoples Health member fills a prescription at a pharmacy, Peoples Health may have responsibility for paying the pharmacy for some or all of the cost of the prescription.  When it does so, Peoples Health's Pharmacy Benefit Manager ("PBM")—who at all times relevant to this lawsuit was CVS Caremark—creates a PDE.  *Id. 179:14-182:5*.  The PDE effectively serves as a claim for payment.  *Id*.  The PBM submits it to CMS on Peoples Health's behalf.  *Id*.  CMS then either approves the PDE or rejects it.  *Id*.  Approval of a PDE by CMS is confirmation that CMS agrees Peoples Health should have paid to fill the prescription and that CMS agrees it should be treated as a covered plan payment.  *Id*.  If CMS rejects a PDE, it notifies Peoples Health.  *Id*. Sometimes, CMS also approves PDEs, but flags them has having some sort of anomaly that

Peoples Health must resolve.  *Id. 182:6-13*.  Romero spent most of her time resolving PDE rejections and anomalies.  *Id. 183:5-14; 189:7-10*.  Ultimately, Romero's objective was to ensure that Peoples Health was "getting paid by CMS for claims it should be getting paid for and not getting paid by CMS for claim that it shouldn't be."  *Id. 183:15-20*.

To resolve PDEs, Romero would review reports received from the PBM identifying all of the rejected PDEs and providing information about the reason for the rejection.  *Id. 190:13-199:24*.  There are myriad reasons CMS may reject a PDE.  However, the most common reasons are plan-to-plan (or P-to-P) rejections, Low Income Subsidy rejections, and date of death rejections. *Id. 193:21-25, 205:5-210:1, 219:24-222:6*.

Plan-to-plan rejections occur when CMS rejects a PDE because it finds that Peoples Health was not responsible for paying for the prescription drug because a member left Peoples Health's plan and went to another plan that should have paid for the drug.  *Id. 193:21-194:25*.  In those instances, Romero was responsible for ensuring that Peoples Health received payment from the other plan and for determining the reason for any differences between the amount Peoples Health paid and the amount the other plan reimbursed it.  *Id. 196:24-199:18*.

Low Income Subsidy rejections occur when CMS rejects PDEs due to concerns about a member's eligibility for the subsidy.  *Id. 205:5-210:6*.  These rejections are "immediately actionable," meaning that CMS expects Peoples Health to resolve them quickly and in a limited time.  *Id. 207:1-3*.  When CMS rejected PDEs on this basis, Romero was required to investigate the reason for the rejection and to confirm with respect to each whether CMS' rejection was proper.  *Id. 208:21-25*.  She also was required to determine what steps, if any, Peoples Health needed to take to correct any errors.  *Id. 208:25-209:1*.

16

Date of death rejections occur when a pharmacy fills a prescription after a member's date of death. *Id. 219:24-222:6*. When those rejections occurred, Romero was responsible for investigating them to determine whether CMS' rejection was proper and, if not, to identify the reason why and correct it so Peoples Health could resubmit the PDE. *Id*.

Through her work resolving PDEs and investigating anomalies, Romero ensured that Peoples Health was receiving compensation from CMS when it was owed and, as importantly, was not receiving compensation that was not owed. She also ensured that the data Peoples Health supplied to its actuaries for their use in preparing Peoples Health's annual bid to CMS accurately reflected the amount Peoples Health was obligated to pay for its members' prescription drugs. *Id. 223:14-224:19*. In this regard, Romero acknowledged that Peoples Health pays hundreds of millions of dollars of prescription drug claims each year and that her efforts resolving PDEs resulted in a reduction of CMS rejections. *Id. 280:15-282:7*.

Romero agrees that her Pharmacy Part D Specialist role required her to be a problem-solver, to analyze data, and to ensure the integrity of Peoples Health's data. *Id. 246:2-247:19; 278:14-24*. She admits that she was the "subject matter expert" at Peoples Health for PDE submissions, rejection resolution, retractions, and adjustments. *Id. 250:2-22*. She also admits that she worked independently and only interacted with her direct supervisor, Sean Kennedy, on a limited basis. *Id. 257:2-260:10*. Indeed, she performed her work so independently that she testified that she was unsure that Kennedy could do her job in her absence. *Id. 279:16-24*.

17

## II.   LAW AND ARGUMENT.[7]

### a.   Peoples Health properly classified all Plaintiffs as exempt.

The FLSA requires covered employers to compensate nonexempt employees at overtime

rates for time worked in excess of statutorily defined hours, but exempts employees occupying

"bona fide executive, administrative, or professional" positions from its overtime requirements.

29 U.S.C. §§ 207 and 213(a)(1).  Whether an employee is exempt from the overtime

compensation requirement is primarily a question of fact, but the ultimate issue is a question of

law.  *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 584 (5th Cir. 2006); *Lott v. Howard Wilson*

*Chrysler-Plymouth, Inc.,* 203 F.3d 326, 330-31 (5th Cir. 2000).  In deciding this legal question,

the Supreme Court has instructed that exemptions are "as much a part of the FLSA's purpose as

the overtime-pay requirement" and that courts "have no license to give the exemption anything

but a fair reading." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).[8]

### i.   Jones, Breaux, Perez, Crowder, Branch and Romero were administratively exempt.

An employee is administratively exempt if:

1.  His employer compensates him on a salary or fee basis at a rate of not less than
    $455 per week;

---

[7] Summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). As the moving party, Peoples Health need only point out the absence of evidence supporting the nonmoving party's case – it "need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(emphasis in original); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to Jones to "make a showing sufficient to establish the existence of an element essential to that party's case[.]" *Celotex,* 477 U.S. at 322-23. If he fails, "there can be no genuine issue as to any material fact since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. Jones "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). He cannot rest on his allegations and denials; he must provide significant probative evidence that would enable a jury to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

[8] A number of the cases cited by Peoples Health were decided before *Encino* and state that courts must presume that employees are non-exempt and to "narrowly construe" the FLSA's exemptions.  *Encino* rejected that standard and, in that regard, expressly overruled the cited cases on that point.

2. His primary job duty involves the performance of office or non-manual work directly related to the management or general business operations of the employer or its customers; and

3. His primary duty includes exercising discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

The term "primary duty" means the principal, main, major or most important duty that the employee performs. 29 C.F.R. § 541.700(a). Notably, nothing in the regulations "requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." 29 C.F.R. § 541.700(b).

The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment. 29 CFR 541.201.

In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after considering the various possibilities. 29 C.F.R. § 541.202(a). The DOL regulations instruct courts to apply the phrase "discretion and independent judgment" in the light of all the facts involved in the particular employment situation in which the question arises. 29 C.F.R. § 541.202(b). Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to:

- whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;
- whether the employee carries out major assignments in conducting the operations of the business;
- whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;
- whether the employee has authority to commit the employer in matters that have significant financial impact;
- whether the employee has authority to waive or deviate from established policies and procedures without prior approval;
- whether the employee has authority to negotiate and bind the company on significant matters;
- whether the employee provides consultation or expert advice to management;
- whether the employee is involved in planning long- or short-term business objectives;
- whether the employee investigates and resolves matters of significance on behalf of management; and
- whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id*.

The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. 29 C.F.R. § 541.202(c). However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. *Id*. Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. *Id*. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. *Id*. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment. *Id*.

### 1. The Contracting Specialists (Jones, Perez, Breaux, and Crowder) were administratively exempt.

There is no genuine dispute that Peoples Health paid all of the Contracting Specialists on a salary basis of at least $455 per week or that their primary job duty involved office and non-manual work relating to building and maintaining a network of health care providers to render services to Peoples Health's members. *Thompson at ¶18a*; *Jones Disc. at Int. 8* (admitting that the Contracting Specialist role involved office or non-manual work). Moreover, the Court should have no trouble concluding that their work directly related to Peoples Health's general business operations given that Peoples Health undisputedly could not do business without a network of providers to render services to its members. *See, e.g., Branch 223:3-5*; *Hall 33:7-10*; *Breaux 48:8-11*. Lastly, the plaintiffs' own descriptions of their work proves that their primary job duties required them to exercise discretion and independent judgment about significant matters.

As stated above, employees who "carr[y] out major assignments in conducting the operations of the business" and "perform[] work that affects business operations to a substantial degree" generally exercise sufficient independence and discretion in their job to qualify for the administrative exemption. 29 C.F.R. § 541.202(b). The Contracting Specialists are the primary points of contact for Peoples Health in carrying out the major assignment of identifying and recruiting the network of healthcare providers the company must have to conduct business. As Jones explained, to "build the network," the Contracting Specialists have to develop and execute on "thoughtful well-planned strategy" and "establish credibility and trust." *Jones II 52:21-53:8*; *Jones I at Ex. 11*. Their work identifying, liaising with, networking with, and recruiting providers affects Peoples Health's business operations substantially because it informs the

company's ultimate decisions regarding which providers Peoples Health should seek to include in its network and enables those contracts to come to fruition.

The Contracting Specialists' job duties are similar to those of employees in other industries, which courts have found to be administratively exempt. For instance, in *Andrade v. Aerotek, Inc.*, 700 F. Supp. 2d 738 (D. Md. 2010), the plaintiff, a recruiter and account recruiting manager for a staffing company, alleged that her employer misclassified her as administratively exempt. *Andrade*, 700 F.Supp.2d at 740. The court disagreed and granted summary judgment for the employer. *Id*. at 748. In doing so, the court noted that the plaintiff sourced, screened, and interviewed prospective candidates; used tools to track communication with them; called and arranged meetings with them; determined if the candidate would be a good fit; prepared "submission statements" about the candidates for the account managers;[9] and gave input about the candidates. *Id.* at 741-744. The fact that the plaintiff did not have the power to make any ultimate employment decisions or that supervisors reviewed her recommendations did not bar application of the administrative exemption. *Id*. at 747-748. The court in *Drake v. Aerotek, Inc.,* 2016 U.S. Dist. LEXIS 1597 (W.D. Wisc. Jan. 7, 2016), reached a similar result, granted summary judgment finding the plaintiff recruiter administratively exempt, and dismissed his claims.

In *Hines v. Longwood Events, Inc.,* 2010 U.S. Dist. LEXIS 62259, *2 (D. Mass. June 10, 2010), *aff'd sub nom. Hines v. State Room, Inc.,* 665 F.3d 235 (1st Cir. 2011), the plaintiffs sued alleging that her employer had misclassified her as administratively exempt. The trial court disagreed and granted summary judgment for the employer and the First Circuit affirmed. *Hines*, 2010 U.S. Dist. LEXIS 62259 at *27. There, the plaintiffs were sales managers who worked at event venues. *Id*. at *3. They were responsible for cold calling lists of clients provided by their

---

[9] These submission statements are comparable to the "cover sheets" that the Contracting Specialists prepared.

employer and working with potential clients who contacted the venue on their own initiative.  *Id*. at \*8.  They would meet with the clients to assess their needs and persuade them to book their event at the venue.  *Id*.  They were required to work within guidelines, but did not use scripts in their client interactions.  *Id*.  Once they convinced a client to host an event at the venue, they would have the client execute a contract with a supervisor's approval.  *Id*.  The contracts were form agreements.  *Id*.  After finalizing the contract, the plaintiffs would work closely with the clients to plan the details and execute their event, managing the client's expectations, and reporting problems to management.  *Id*. at \*10.

Based on this set of facts—including the fact that the plaintiffs had to determine how to respond to individualized client concerns, how best to "pitch" the venue, and that they acted as the "primary conduit" between the employer and the clients—the court found them administratively exempt.  *Id*. at \*21-22.  The fact that the plaintiffs had "no role in shaping management policies," "little ability to 'negotiate' contracts or obligate the defendants financially without supervisory approval," "could not deviate from defendants' established policies," and "exercised no discretion in selecting prospective clients to approach," were "not dispositive" and did not defeat summary judgment.  *Id*. at \*23-24.

In reaching it ruling in *Hines*, the court cited *Reich v. John Alden Life Insurance Co.,* 126 F.3d 1 (1st Cir. 1997).  In *Reich*, the court found an insurer's marketing representatives—whose job it was to "cultivate [an] independent agent sales force" to market its product— administratively exempt notwithstanding that they received guidance about suggested points of emphasis during an initial training period and at weekly sales meetings and that they had no authority to approve or deny certain applications once submitted.  *Reich*, 126 F.3d at 3-4.  It found the marketing representatives exercised sufficient independence and discretion by

choosing which agents to contact, deciding which products to discuss with them, and relying on their own knowledge to determine how to tailor proposals and to distinguish their employer's offerings from those of competitors. *Id*. at 13.

Other courts also have found relationship building and networking activities to be administratively exempt. *See, e.g., Cue-Lipin v. Callanwolde Found., Inc.*, 1 F. Supp. 3d 1359, 1363 (N.D. Ga. 2014) (plaintiff exercised independence and discretion regarding significant matters by soliciting new professional relationships, constantly communicating with clients, and building client relationships and the administrative exemption was not inapplicable just because she used tour scripts, form rental contracts, and was "mostly confined by a set pricing schedule"). *See also, Burton v. Appriss, Inc.,* 682 Fed. Appx. 423, 431-32 (6th Cir. 2017) (noting that plaintiff exercised independence and discretion by "evaluating existing relationships, renewing existing business, and developing a strategy to grow the relationship.")

Despite their arguments to the contrary, the Contracting Specialists played a vital role in maintaining Peoples Health's existing provider network and in the company's effort to expand that network to new markets. They were not automatons. They were business developers who, before it was convenient to say otherwise in this lawsuit, trumpeted their successes and business development wins. *See, e.g., Jones I at Exs. 11, 12, 14, 17, and 19 and Jones II 53:1-8.*

Like the recruiters in *Andrade* and *Drake*, the Contracting Specialists sourced providers, used tools to track communications with them,[10] called and arranged meetings with them, made judgments about the providers' level of interest in joining Peoples Health's network, and prepared "cover sheets" containing input and recommendations for the contracting committee's consideration. Similar to the plaintiffs in *Hines*, the Contracting Specialists "pitched" Peoples

---

[10] All of the Contracting Specialists testified that they used ProviderTrak to track their communications with providers. Indeed, that is a primary function of the software.

Health and served as the "primary point of contact" between Peoples Health and its provider network at the contracting stage. As in *Reich*—as Jones attested—the Contracting Specialists were required to develop strategy and to rely on their own knowledge and instincts to persuade providers of the benefits of doing business with Peoples Health, even if they initially gave "no" for an answer. Moreover, the fact that the Contracting Specialists did not have final decision-making authority with respect to whether to contract with providers or independent authority to negotiate contract terms does not render the administrative exemption inapplicable to them. *Lott v. Howard Wilson Chrysler-Plymouth, Inc.,* 203 F.3d 326, 331 (5th Cir. 2000) ("Final decision making authority of matters of consequence is unnecessary.") Based on the Contracting Specialists' own testimony and descriptions of their work, the Court should find that Peoples Health properly classified all of them as administratively exempt.

## 2. Branch's Operations Specialist position was administratively exempt.

In her Operations Specialist role, Peoples Health paid Branch a salary of more than $455/week to perform office work. *Thompson at ¶37.* Her job, which required to her examine processes and workflows to look for a means to improve efficiency—usually through software improvements and workforce training—unquestionable related directly to Peoples Health's general business operations. *Branch 74:16-19, 83:4-12, 83:20-25; Courtney 11:12-12-13.* It also is beyond any genuine dispute that Branch exercised independence and discretion regarding significant matters in performing her job.

In addition to explaining that employees generally exercise independence and discretion in their job if they "carr[y] out major assignments in conducting the operations of the business" and perform "work that affects business operations to a substantial degree, even if the

25

employee's assignments are related to operation of a particular segment of the business," the

DOL regulations instruct that:

> [a]n employee who leads a team of other employees assigned to complete major
> projects for the employer (such as purchasing, selling or closing all or part of the
> business, negotiating a real estate transaction or a collective bargaining
> agreement, or **designing and implementing productivity improvements**)
> generally meets the duties requirements for the administrative exemption, even if
> the employee does not have direct supervisory responsibility over the other
> employees on the team. [Emphasis added.]

29 C.F.R. § 541.202(c). Branch's job responsibilities fall squarely into the categories above.

Branch's role specializing in operations undoubtedly "affected" and involved

implementation of operating practices. Her work re-writing the ProviderTrak specifications

unquestionably was a "major assignment" relating to "designing and implementing productivity

improvements" for Peoples Health. As Branch herself admitted, multiple departments

throughout Peoples Health used ProviderTrak. She dedicated substantial time every week

working to improve the system's efficiency. The result of her efforts affected the business

operations of multiple departments within the company and enabled them to better communicate

and "streamline" the process of contracting with the providers.

A number of courts have recognized that work like Branch's that is designed to improve

processes and create efficiencies qualifies as administratively exempt. *See, e.g., Grupke v. GFK*

*Custom Research North America*, 2015 WL 363589, \*7 (S.D. N.Y. Jan. 28, 2015) (finding that

plaintiff exercised discretion and independent judgment where her duties included identifying

opportunities for improvements and implementing changes that increased efficiencies); *Westman*

*v. Al Frank Asset Mgmt.*, 2013 WL 1729548 (C.D. Cal. April 8, 2013) (finding plaintiff to be

administratively exempt where, *inter alia*, she advised executives on improvements to systems

and billing processes that would increase efficiency, created internal workflows and processes,

and trained others on same); *Schreckenbach v. Tenaris Coiled Tubes, L.L.C.,* 2013 WL 178126,

\*8 (S.D. Tex. Jan. 16, 2013) ("Plaintiff's assignment to reformulate the scheduling system was

broad enough to qualify as work related to the general business operations of Tenaris, and of

substantial importance to management or operations."); *Fox v. Lovas*, 2012 WL 692131, \*7

(W.D. Ky. Mar. 2, 2012) (determining that plaintiff was "employed 'in a bona fide

administrative capacity'" where "[f]inding and resolving errors" was plaintiff's primary duty and

"a task left to her discretion and independent judgment"); *Valles v. IBM*, 2010 U.S. Dist. LEXIS

145344, \*15-18 (C.D. Cal. May 6, 2010)[11] (finding that plaintiff's responsibilities "driving

problem determination, enforcing process compliance and recommending process

improvements" directly related to the general business operations of the employer's customers

and that he exercised discretion by deciding how to manage outages, identifying deficiencies,

and suggesting improvements); *Johnson v. Robert Bosch Tool Corp.,* 2008 U.S. Dist. LEXIS

80053, \*113 (W.D. Ky. Oct. 7, 2008) (finding the plaintiff plant work administratively exempt,

in part, because his primary job duties involved analyzing problems and proposing solutions to

help improve efficiency).

Moreover, the fact that most of Branch's work was computer-based and that it required

her to input data, create documents, and generating reports does not preclude application of the

administrative exemption. *See Paul v. UPMC Health System*, 2009 WL 699943, \*12 (W.D. Pa.

Mar. 10, 2009) (concluding that even though plaintiff's "position may have largely involved the

entry of data, . . . she nevertheless had to exercise her own judgment in accomplishing that

task."); *DeWalt v. Greencroft Goshen, Inc*., 902 F.Supp.2d 1127, 1134 (N.D. Ind. 2012) (finding

plaintiff to be exempt despite her assertion that she spent 40% of her time entering information

into the computer).

---

[11] This case applied California law, but noted that it parallels federal law.

In the self-evaluation forms Branch furnished to Peoples Health to obtain pay raises and in the resumes she provided to the company to receive promotions, she described herself as someone who "conceptualized" and "blueprinted" efficiency improvements and as a "project co-lead" under whose "oversight and direction" the ProviderTrak re-write kicked off.  *Branch Exs. 12 and 14*. Branch now disclaims these representations.  However, she cannot escape her own admission that her role required **"assessing need, making recommendations to change current processes or creating new processes, [and] creating strategies to remediate need…"** *Branch Disc. at Int. No. 8*.   She also cannot deny that she made recommendations and operational changes that Peoples Health implemented or that she was required to use independent thought and judgment in doing so.  Based on Branch's own testimony, the Court should find that Peoples Health properly classified her as exempt.

### 3.   Romero's Pharmacy Part D Specialist position was administratively exempt.

Peoples Health paid Romero an annual salary of $68,296.65, which is substantially more than $455 per week, and she performed office work.  *Thompson at ¶37*.  Her work resolving PDEs related directly to Peoples Health's general business operations by ensuring proper payment to Peoples Health for PDEs and that the data Peoples Health used to make significant financial decisions (including formulating its annual contract bid to CMS) was accurate. *Romero 223:14-224:19, 280:15-282:7*.  As Romero's own testimony established, she also exercised independence and discretion in performing her work, which was significant to Peoples Health.

Regarding independence, Romero testified that she rarely interacted with her immediate supervisor, Kennedy.  *Id. 257:2-260:10*.  She acknowledged that she was a subject-matter expert who did not need his input to perform her job duties.  *Id. 279:16-24*.  In fact, she testified that

she worked so independently that she was unsure that Kennedy could even do her job in her absence. *Id.*

Regarding the exercise of discretion and independent judgment, Romero admitted that when she received the CMS report identifying all rejected claims, it was her responsibility to investigate the reason for the rejection and to "resolve" it. *Id. 188:21-24.* There were myriad reasons CMS rejected PDEs and, although some reasons were more common than others, most of them required Romero to perform independent work and to judge whether or not the rejection was proper. *Id. 208:21-25, 211:7-9, 215:17-216:6, 221:12-222:6.* If she concluded it was, she took no further action. She did not need to seek any input or approval from Kennedy. *Id. 216:1-16.* Those decisions, which Romero made daily, financially impacted Peoples Health because— based on Romero's judgment alone—Peoples Health effectively was accepting CMS' position that it was ineligible for compensation on certain claims.

Using her admitted ability to problem solve and analyze data, Romero was able to resolve PDEs independently and to improve the integrity of the data upon which Peoples Health's actuaries relied when preparing the company's annual bid to CMS. *Id. 223:14-224:13; 246:2-247:19; 278:14-24.* These activities are precisely the sort that courts recognize involve the exercise of independence and discretion. *See, e.g., Crowe v. ExamWorks, Inc.,* 136 F. Supp. 3d 16 (D. Mass. 2015) (finding Clinic Quality Assurance Coordinators who worked for a company that provided IME-related services administratively exempt because they exercised independence and discretion in reviewing reports written by physicians to ensure their quality, integrity and compliance with regulations); *Zalewski v. PNC Fin. Servs. Group,* 2008 U.S. Dist. LEXIS 70026 (W.D. Pa. Feb. 4, 2008) (finding the plaintiff administratively exempt where her job duties entailed "compiling required reports for filings and audits, analyzing balance sheets

and income statements, verifying financial reports/data, and monitoring tens of millions of

dollars in investments for accuracy/compliance."); *McAllister v. Transamerica Occidental Life*

*Ins. Co.*, 325 F.3d 997 (8th Cir. 2013) (finding the plaintiff, a claims adjuster for a life insurance

company, administratively exempt because her job required her to problem-solve and to use

"good common sense judgment" even though her employer required her to follow detailed

manuals in her work.)

Regarding the significance of her work, Romero admits she was responsible for ensuring

proper payment on Peoples Health's hundreds of millions of dollars of paid prescription drug

claims.  This undeniably was significant to Peoples Health.

Based on Romero's own testimony, it is apparent that she "carrie[d] out major

assignments in conducting the operations of [Peoples Health's] business" and that she

"perform[ed] work that affect[ed] business operations to a substantial degree."  29 C.F.R.

§541.202(b).  She also considered herself to be an expert and unquestionably "investigate[d] and

resolve[d] matters of significance" to Peoples Health.  *Id*.  Considering the DOL guidance and

the germane case law, the Court should find that Peoples Health properly classified Romero as

administratively exempt.

### ii. Hall's combined administrative and executive duties qualify her as exempt.

The FLSA provides:

> Employees who perform a combination of exempt duties as set forth in the
> regulations in this part...may qualify for exemption. Thus, for example, an
> employee whose primary duty involves a combination of exempt administrative
> and exempt executive work may qualify for exemption. In other words, work that
> is exempt under one section of this part will not defeat the exemption under any
> other section.

29 C.F.R. § 541.708. This exemption addresses "the situation that exists when an employee does not meet the primary-duty requirement of any individual exemption." *King v. Stevenson Beer Distrib. Co*., 11 F. Supp. 3d 772, 786 (S.D. Tex. 2004) (quoting *IntraComm, Inc. v. Bajaj,* 492 F.3d 285, 294 (4th Cir. 2007)).  It is "a mechanism for cobbling together different exempt duties for purposes of meeting the primary-duty test." *Id.*  Here, Hall's combined administrative and executive duties qualified her as exempt.

The requirements of the administrative exemption are set forth in Section II(a)(i) above. The executive exemption applies to any employee who (1) is paid at least $455 per week, (2) whose "primary duty is management," (3) who "customarily and regularly directs" at least two other employees, and (4) who has hiring and firing authority, or whose suggestions about promotion and termination are "given particular weight."  *Chambers v. Sodexo, Inc.*, 510 Fed. Appx. 336, 339 (5th Cir. 2013) (quoting 29 C.F.R. § 541.100).  "Management" includes, but is not limited to, interviewing, selecting, and training employees; appraising employees' productivity and efficiency to recommend promotions or status changes; handling employee complaints and grievances; and disciplining employees.  29 C.F.R. § 541.102. Courts have held that "supervision of other employees is clearly a management duty" and that "[e]nsuring that company policies are carried out constitutes the very essence of supervisory work."  *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982) (internal quotation omitted); *Reyes v. Tex. Ezpawn, L.P.*, 459 F.Supp.2d 546, 557 (S.D. Tex. 2006) (quoting *Donovan); Beauchamp v. Flex-N-Gate, L.L.C.*, 357 F.Supp.2d 1010, 1017 (E.D. Mich. 2005) (same).

Hall supervises two direct reports—a Contracting Specialists and a Contracting Coordinator—while also performing duties similar to those of the Contracting Specialists (though she has even more responsibility than most of them because of her subject-matter

expertise in contracting ancillary services).  Hall may argue that her contracting responsibilities are primary.  If the Court agrees, it should find that she qualifies for the administrative exemption.[12]  However, Peoples Health contends that Hall's role falls within the combination exemption because she regularly performs both contracting and management responsibilities with neither being primary.  Regardless, most of Hall's time is spent performing exempt tasks, such as supervising and directing the work of her subordinate employees; receiving inquiries from ancillary service providers and determining how to respond to them; and preparing materials and recommendations to inform the decisions of Peoples Health's contracts committee when it considers how to respond to their inquiries.  *Hall 74:5-20, 36:20-40:1, 179:21-180:16.*  In addition to the foregoing tasks that are ongoing and occur daily and weekly, Hall performs annual evaluations of her subordinates' job performance, interviews candidates for hire, and recommends them for promotions and other job opportunities.  *Id. 88:8-89:1, 76:4-79:22, 134:11-24, 136:5-140:9, 141:8-146:3.*

Regarding the weight given to her input as a manager, Hall admits that Peoples Health uses her performance evaluations to determine the pay raises for her subordinates and accepted her recommendation to hire Amy Dinette.  *Id. 88:8-89:1, 144:18-146:3.*  She also admits that Janice Ortego, the Senior Vice President of Network Development, accepted her recommendation to transfer Gina Austin to a different position over the objection of her immediate supervisor Anthony Bonck.  *Id. 1366:5-140:9.*

Hall's recommendations relating to her contracting activities enjoy the same weight.  Hall admits that Peoples Health considers her the subject-matter expert for ancillary contracting.  *Id. 180:22-25.*  The members of its contracting committee look to her to provide information and to

---

[12] Hall's job duties qualify her for the administrative exempt for the same reason the Contracting Specialists qualify for that exemption and arguably the exemption apples with even greater force to her.

make recommendations (which she does in person at their meetings) as to how it should handle contracting with ancillary providers.  *Id. 36:20-40:1, 179:21-180:16.*  Hall admits that the committee has taken her recommendations.  *Id. 38:20-22.*

Based on Hall's own description of her work, the Court should find that her combined duties qualify her as exempt.

### b.  Jones' individual LWPA claim is not actionable as a matter of law.

In addition to seeking to recover under the FLSA on his claim for allegedly unpaid overtime, in the Complaint, Jones alleges that Peoples Health is liable to him under the LWPA because it "refused to compensate him for his unpaid overtime work."  *Doc. 1 at ¶86.*  However, courts in this judicial district have "consistently held that the FLSA provides an exclusive remedy for overtime violations."  *Smith v. Ochsner Health Sys.,* No. 17-9899, 2018 U.S. Dist. LEXIS 79822, *3 (E.D. La. May 11, 2018) (citing *Smith v. Diamond Offshore Mgmt. Co.,* No. 03-2024, 2003 U.S. Dist. LEXIS 23345 (E.D. La. Dec. 23, 2003); *Barrois v. Hilton Title,* No. 96-727, 1996 U.S. Dist. LEXIS 8172 (E.D. La. June 10, 1996)).  Louisiana state courts have reached the same conclusion.  *Odom v. Respiratory Care, Inc., No*. 98-0263 (La. App. 1 Cir. 2/19/99), 754 So.2d 252, 256 ("[T]here is a distinction between an employer timely paying earned wages for all hours worked, and an employer refusing to pay the extra wages and employee claims are due on the hours he worked in excess of the statutory minimum.  The payment of overtime wages is clearly governed by the FLSA.")

In *Ochsner*, an FLSA misclassification case decided last year, Judge Milazzo found that the plaintiff's argument that he was entitled to pursue a claim for penalties under the LWPA based on his employer's alleged overtime violations "misse[d] the point" because the plaintiff "would have no cause of action under state law but for the existence of the FLSA."  2018 U.S.

Dist. LEXIS 79822, *4.  The same rationale applies here and the Court should reach the same result.  For, the same reasons other courts in this judicial district consistently have held that plaintiffs are not entitled to relief under the LWPA for FLSA violations, the Court should dismiss Jones' individual LWPA claim.

### c. Because Peoples Health acted in good faith to classify Plaintiffs, the two-year limitations period applies.

The statute of limitations under the FLSA is two years, except in cases of willful violations, in which it is three years. 29  U.S.C. § 255(a).  Plaintiffs bears the burden of proving willfulness.  *Cox v. Brookshire Grocery Co.*, 919 F.2d 354 (5th Cir. 1990).  To do so, they must provide evidence establishing that Peoples Health "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]."  *Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903 (E.D. La. 2009) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  Plaintiffs cannot meet this burden by demonstrating that Peoples Health was negligent or merely incorrect in its classification, or even by demonstrating that its actions were unreasonable.  *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407 (5th Cir. 1990) (negligent violation is not willful); *McLaughlin*, 486 U.S. at 135 (incorrect assumption that a pay plan complied with the FLSA was not willful); *Id.* at 135 n.13 (even unreasonableness is not sufficient to establish a willful violation).

If an FLSA plaintiff fails to provide evidence at the summary judgment stage from which a reasonable jury could conclude that the defendant acted willfully, entry of summary judgment on this issue is proper.  *See, e.g., Valcho v. Dallas County Hosp. Dist.*, 658 F. Supp. 2d 802 (E.D. Tex. 2009) (granting summary judgment finding that the two-year limitations period applied because plaintiff did not produce any evidence that would enable a reasonable jury to find that defendant's classifying her as exempt was a willful contravention of the FLSA); *Burns v.*

*Blackhawk Mgmt. Corp.*, 494 F. Supp. 2d 427 (S.D. Miss. 2007) (summarily deciding that a two-year statute of limitations period applied because the evidence showed that a Human Resources employee evaluated plaintiff's exempt status by comparing his job duties to the law after he complained and concluded the company had properly classified his position as exempt).

Here, even if Peoples Health violated the FLSA (which it did not), there is no evidence to establish a *willful* violation. In contrast, the undisputed record evidence establishes that Peoples Health made extraordinary and good faith efforts to ensure that it classified all Plaintiffs properly. As Erin Thompson's declaration establishes, before UHC acquired Peoples Health (which is the period relevant to this inquiry), Peoples Health maintained an HR Department with employees certified by organizations that specialize in HR compliance. *Thompson at ¶10.* It maintained policies recognizing the FLSA's requirements and stating the company's intent to comply with them. *Id. at ¶23 and Ex. A4.* It made individualized determinations as to whether certain employees qualified as exempt based on their job duties and compensation. *Id. at ¶24.* It also sought to insure that the job descriptions upon which it relied to make classification determinations were accurate by maintaining policies and training on them and inviting employees on an annual basis to give input regarding any needed changes to their job descriptions. *Id. at ¶25-26 and A6.*

Peoples Health had no reason to believe it misclassified Plaintiffs and none of them complained that it had done so before they filed this lawsuit. Nor had any of them told Peoples Health that they believed they were entitled to overtime compensation. *Id. at ¶38.* Because Peoples Health can demonstrate its good faith effort to comply with the FLSA and Plaintiffs cannot present evidence to the contrary, Peoples Health is entitled to judgment as a matter of law finding the two-year statute of limitations applicable in this case.

### d. Liquidated damages are unavailable.

Any employer who violates the overtime pay provisions in the FLSA is liable for "unpaid overtime compensation . . . and an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). A court can, however, use its discretion to deny liquidated damages if the employer "shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. The purpose of section 260 is to allow the court to lessen the harshness of the liquidated damages provision by imposing merely compensatory damages. *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468 (5th Cir. 1991). This is because the FLSA "is designed and intended as a shield to protect the unwary and not as a sword on which to impale an unsuspecting employer who is engaged in a business and honestly exercises a reasonable effort in good faith to comply with all the required provisions of such act." *White v. Beckman Dairy Co.*, 352 F. Supp. 1266, 1271 (W.D. Ark. 1973) (quoting *Wirtz v. Harrigill*, 214 F. Supp. 813, 815 (S.D. Miss. 1963)).

An employer can avoid liability for liquidated damages under the FLSA if it shows that it "'had an honest intention to ascertain what the Act requires and to act in accordance with it'." *Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 903, 926 (E.D. La. 2009) (quoting *Dybach v. State of Fla. Dept. of Corrections,* 942 F.2d 1562, 1566 (11th Cir. 1991)). Moreover, courts have refused to award liquidated damages where employers relied on a plaintiff's job description to determine whether to classify them as exempt, **even when the plaintiff later denied that the job description accurately reflected the tasks he performed**. *See, e.g., Astor v. United States,* 79 Fed. Cl. 303 (Fed. Cl. 2007) (refusing to award liquidated damages on summary judgment based on finding that the defendant acted "in 'good faith' or with 'reasonable grounds for

36

believing'" that the plaintiffs were exempt in light of their job descriptions, although the plaintiffs testified they were inaccurate). *See also Rivera v. McCoy Corp.*, 240 F.Supp.3d 1150 (D. N.M. 2017) (refusing to award liquidated damages because the record evidence showed that the defendant made an honest attempt to comply with the law, including by determining how to classify the plaintiffs by referencing their job descriptions, even though they did not accurately describe the job).

As demonstrated by the record evidence, Peoples Health had an honest intention to understand the FLSA's requirements and to classify Plaintiffs properly based on that understanding. Although Plaintiffs now claim their job descriptions did not accurately reflect their work, Peoples Health acted reasonably in relying on those descriptions to determine Plaintiffs' exempt status. There is no evidence to prove—or even to suggest—that Peoples Health misclassified Plaintiffs in a deliberate attempt to circumvent the purpose of the FLSA. Accordingly, for the same reasons the court refused to award liquidated damages in *Johnson, Dybach, Astor,* and *Rivera*, the Court should find that Plaintiffs are not entitled to recover liquidated damages as a matter of law.

### e. The fluctuating workweek method applies to computing Plaintiffs' damages.

The appropriate methodology to determine the total amount of overtime pay owed in an FLSA case is a question of law. *Ransom v. M. Patel Enterprises, Inc.*, 734 F.3d 377 (5th Cir. 2013). The fluctuating workweek ("FWW") method of calculating overtime is the correct method to use when the employer and the employee have agreed that the employee will receive a fixed weekly wage to work fluctuating hours. *Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135 (5th Cir. 1988). In other words, when employees understand their employer will pay them a fixed weekly salary to "work whatever number of hours were required to get the job done,"

37

then the court should use the FWW method to compute their damages if it ultimately concludes

their employer misclassified them.  *Blackmon*, 835 F.2d at 1137.  This agreement need not be in

writing.  *Ransom*, 734 F.3d at 382.

Using the FWW method to compute damages impacts both the regular rate and the

multiplier used to compute damages.  The Fifth Circuit described "the correct method of

calculating unpaid overtime" using the FWW in *Ransom* as follows:

> Divide the *actual hours worked* each workweek into the fixed salary.  Then, the
> overtime payment for that week is determined by multiplying all hours over 40 in
> the workweek by ½ the regular rate for that workweek.  [Emphasis in original and
> internal citations omitted.]

To determine whether the employer and employee agreed that the employer would pay

the employee a fixed weekly salary for all hours he worked in a week, courts may consider the

parties' conduct.  *Singer v. City of Waco,* 324 F.3d 813, 824 (5th Cir. 2003) (citing 29 C.F.R.

§778.108 ("We can determine how many hours the salary "is intended to compensate" by

examining what happens under the contract."); *see also Urnikis-Negro v. Am. Family Prop.*

*Servs*., 616 F.3d 665, 681, n.8 (7th Cir. 2010) ("The existence of [a FWW] agreement . . . may be

inferred from the parties' conduct."); *see also Monahan v. County of Chesterfield*, 95 F.3d 1263,

1281, n.21 (4th Cir. 1996) ("[T]he existence of a clear mutual understanding under § 778.114

can be based on the implied terms of one's employment agreement if it is clear from the

employee's actions that he or she understood the payment plan in spite of after-the-fact verbal

contentions otherwise.")  The fact that a plaintiff testifies that she understood there would be

workdays longer than eight hours and that she accepted a fixed salary for fluctuating hours for

years without complaint evidences her understanding that her employer would pay her a fixed

salary for all hours worked.  *See, e.g., Valerio v. Putnam Assocs., Inc*., 173 F.3d 35, 39 (1st Cir.

1999) (granting summary judgment finding the FWW method applicable because the plaintiff

understood the workday may last longer than eight hours and "routinely worked without complaint more than 40 hours per week without extra pay.")

In this case, all Plaintiffs understood that Peoples Health had classified them as exempt and that they were receiving a salary. They understood this meant that they would receive the same fixed amount of compensation every week no matter how many hours they were required to put into the job. *See, e.g., Hall 21:6-11, 21:21-22:2, 53:5-21; Perez 15:8-15; Breaux 18:6-13.* Peoples Health communicated to them through its policies that because of their exempt classification they would "receive the same weekly salary regardless of hours worked," they were "not eligible for overtime," and they were "expected to work as many hours as required to perform the duties of the position." *Thompson at ¶¶24-29 and Ex. A4, A7, and A8.* None of them ever complained to Peoples Health that they believed they had earned overtime that it had not paid to them. *Thompson at ¶38.* Accordingly, the Court should find that the FWW method is appropriate to calculate any damages owed in this case.

## III.   CONCLUSION.

Based on the undisputed material facts supporting this motion, Peoples Health is entitled to judgment as a matter of law dismissing all of Plaintiffs' claims. Alternatively, if the Court does not dismiss all of their claims, it should enter partial summary judgment finding that Peoples Health acted in good faith in classifying Plaintiffs as exempt, such that the two year statute of limitations applies to their claims and that Peoples Health cannot be liable for liquidated damages as a matter of law. Finally, if the Court does not dismiss all claims, it should find that the FWW method applies to calculating any overtime due to Plaintiffs.

Respectfully submitted:

**ADAMS AND REESE LLP**

*/s/ Elizabeth A. Roussel*
ELIZABETH A. ROUSSEL (#27943)
SARA C. VALENTINE (#30773)
4500 One Shell Square
New Orleans, LA  70139
Telephone:  (504) 581-3234
Facsimile: (504) 566-0210
***Counsel for New Orleans Regional Physician***
***Hospital Organization, Inc., d/b/a Peoples Health***
***Network***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 9, 2019, I electronically filed the foregoing with the

Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all

counsel of record.

*/s/ Elizabeth A. Roussel*