UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BILL JONES, ET AL.                                      CIVIL ACTION

VERSUS                                                  NO. 17-8817

NEW ORLEANS REGIONAL PHYSICIAN HOSPITAL              SECTION A(3)
ORGANIZATION, INC. d/b/a PEOPLES HEALTH
NETWORK

## ORDER AND REASONS

Before the Court is a **Motion for Summary Judgment (Rec. Doc. 71)** filed by

Defendant, New Orleans Regional Physician Hospital Organization, Inc. d/b/a Peoples

Health Network ("Peoples Health"). Plaintiffs Bill Jones, Jennifer Branch, Melissa

Breaux, Laura Romero, Nan Nicole Crowder, and Ivette Perez (referred to at times

collectively as "Plaintiffs") oppose the motion. The motion, submitted for consideration

on August 21, 2019, is before the Court on the briefs without oral argument.[1] For the

reasons that follow, the motion is GRANTED.

I.      **Background**

Plaintiffs Bill Jones, Jennifer Branch, and Laura Romero filed a putative collective

action pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*,

against Peoples Health. Peoples Health is a managed care company that offers an

---

[1] The lead named plaintiff in this action, Bill Jones, filed a separate lawsuit against Peoples
Health alleging wrongful termination pursuant to the Fair Labor Standards Act's anti-retaliation
provision. (Civil Action 18-2755). That action was transferred to this section of court on May 21,
2019 because it is related to the instant FLSA collective action against Peoples Health. With the
parties' consent, Jones's retaliation claim was tried to final judgment before this collective
action, which delayed the Court's resolution of the instant motion for summary judgment. Jones
did not prevail on his wrongful termination claim.

insurance product to individuals eligible for Medicare. All of the plaintiffs are former employees of Peoples Health.[2]

The crux of the complaint is that Peoples Health intentionally misclassified certain employees as salaried and "exempt" regardless of their job duties in order to avoid paying them overtime wages as mandated by the FLSA. Plaintiffs claim that Peoples Health implemented record-keeping practices, *i.e.*, prohibiting employees from properly recording hours worked in excess of 40 hours per week, in order to further the misclassification scheme. Plaintiffs seek to recover unpaid minimum wages, unpaid overtime wages, liquidated damages, punitive damages, and attorney's fees.

Additionally, Jones, who was terminated from Peoples Health on May 10, 2017, has brought a claim under the Louisiana Wage Payment Act ("LWPA"), La. R.S. § 23:631, *et seq.*, for wages that he claims were due at the time of his termination.[3]

On October 12, 2018, the Court granted Plaintiffs' motion to conditionally certify an FLSA collective action as to Peoples Health's Network Development Department

---

[2] As of the time that Peoples Health filed its motion for summary judgment (on July 9, 2019), opt-in plaintiff Connie Hall was the only plaintiff still employed with Peoples Health. Ms. Hall was listed as a will-call witness for Jones in the retaliation case, (CA18-2755, Rec. Doc. 61), but Jones determined that her testimony would not be necessary. (Day 1 Transcript at 78). Plaintiff's counsel also stated on the record that Ms. Hall had advised them that she no longer wished to participate in this case so the instant motion for summary judgment should be deemed moot as to her. (*Id.*). Counsel indicated that a motion to withdraw Hall would be filed but as yet none has been filed. The Court treats Ms. Hall's claim as withdrawn and does not address it other than to note that having reviewed the evidence of record, without doubt Hall was an exempt employee for purposes of the FLSA's overtime mandate.

[3] Jones did not address this state law claim as part of his opposition to the motion for summary judgment even though Peoples Health argued that it was not cognizable under Louisiana law. Summary judgment will be granted as to the LWPA claim based on the persuasive authorities cited in Peoples Health's motion for summary judgment.

and its Pharmacy Department for the claim of uncompensated overtime. (Rec. Doc. 37, Order and Reasons). A few consents/joinders were filed; some claimants later withdrew.

As of today, the following <u>Network Development Department</u> individuals remain in the case:

| | |
|---|---|
| **Bill Jones** | **Contracting Specialist—Provider Contracting** |
| **Nan Nicole Crowder** | **Contracting Specialist—Provider Contracting** |
| **Ivette Perez** | **Contracting Specialist—Provider Contracting** |
| **Melissa Breaux** | **Contracting Specialist—Provider Contracting** |
| | |
| **Jennifer Branch** | **Operations Specialist—Operations** |

As of today, the following <u>Pharmacy Department</u> individual remains in the case:

| | |
|---|---|
| **Laura Romero** | **Pharmacy Part D Specialist—Pharmacy Operations** |

Peoples Health now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. Peoples Health argues that it is entitled to judgment as a matter of law on the FLSA overtime claim because all of the foregoing individuals qualify for exempt status. In particular, Peoples Health contends that all of the plaintiffs were working in a "bona fide" administrative capacity. Should the Court decline to dismiss the action in its entirety, Peoples Health moves the Court to determine as a matter of law that a two-year statute of limitations applies to the FLSA claims, that Plaintiffs cannot recover liquidated damages, and that the fluctuating workweek method applies to compute Plaintiffs' damages, if any.

This is a nonjury case. At this time the case is not scheduled for trial. (Rec. Doc. 64).

## II.    Discussion

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir.2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.). The court must draw all justifiable inferences in favor of the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Id.* (citing Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir.1993)).[4]

---

[4] In bench trial cases the district judge has greater discretion to grant summary judgment. *Jones v. United States*, 936 F.3d 318, 323 (5th Cir. 2019). The district judge may "decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." *Id.* (quoting *Johnson v. Diversicare Afton Oaks, LLC*, 597 F.3d 673, 676 (5th Cir. 2010)).

Under the FLSA, an employer must pay overtime compensation to its non-exempt employees who work more than forty hours in a week. *Faludi v. U.S. Shale Solutions, LLC*, 936 F.3d 215, 218 (5th Cir. 2019) (citing *Cleveland v. City of Elmendorf*, 388 F.3d 522, 526 (5th Cir. 2004)); 29 U.S.C. § 207(a)(1). In addition, the FLSA describes various types of exempt employees who are excluded from the overtime requirement. *Id.* (citing 29 U.S.C. §§ 207, 213). Relevant here, the FLSA excludes from the overtime requirement those employees working in a bona fide administrative capacity. *Id.* (citing *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 331 (5th Cir. 2000); 29 U.S.C. § 213(a)(1). For the administrative exemption to apply, the employee's specific job duties and salary must meet all of the requirements of the Department of Labor's regulations. Pursuant to the Code of Federal Regulations, the administrative exemption shall apply to an employee: (1) who is compensated on a salary or fee basis at a rate of not less than $455 per week; (2) whose primary job duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) whose primary job duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a)(1)-(3).

The ultimate decision whether an employee is exempt under these provisions is a question of law.[5] *Faludi*, 936 F.3d at 219 (citing *Lott*, 203 F.3d at 331). The employer has the burden of establishing by a preponderance of the evidence that an FLSA

---

[5] Of course, that ultimate question of law may be premised upon many factual determinations that must be resolved by the fact-finder. *Dewan v. M-I, LLC*, 858 F.3d 331, 334 (5th Cir. 2017) (citing *Singer v. City of Waco*, 324 F.3d 813, 818 (5th Cir. 2003)). In this case, the Court will sit as fact-finder because this is a nonjury case.

exemption applies. *Id.* (citing *Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 581 (5ᵗʰ Cir. 2013)).[6] The FLSA exemptions are not narrowly construed against the employer but rather are given a "fair reading." *Id.* (citing *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018); *Carley v. Crest Pumping Techs., LLC*, 890 F.3d 575, 579 (5ᵗʰ Cir. 2018)).

The Court addresses each of the requirements for exempt status in turn.

### *1) Salary*

For each of the Plaintiffs, Peoples Health must establish by a preponderance of the evidence that he/she was compensated on a salary or fee basis at a rate of not less than $455 per week.

Peoples Health has submitted the declaration of Ms. Erin Thompson, formerly with Peoples Health's Human Resources department.[7] Ms. Thompson attests that at all times relevant, Jones, Breaux, Perez, Crowder, Branch, and Romero were paid on a salary basis earning more than $455 per week with annual salaries as follows: Jones ($64,567.42), Breaux ($56,446.27), Perez ($65,033.85), Crowder ($67,204.80), Branch

---

[6] Because Peoples Health has moved for summary judgment on an issue for which it bears the burden of proof at trial, *i.e.*, that an FLSA exemption applies, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5ᵗʰ Cir. 1991). As in any summary judgment context, the nonmoving party can defeat the motion by merely demonstrating the existence of a genuine dispute of material fact. But because the moving party has the burden of proof under this scenario, the nonmoving party may also defeat the motion by showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party. *Id.* at 1265.

[7] UnitedHealthcare, Inc. ("UHC") acquired ownership of Peoples Health in 2018 while this action was pending. Ms. Thompson now works in UHC's Human Capital Department. (Rec. Doc. 69-3, Def. Exhibit A ¶ 11).

($60,972.41), Romero ($68,296.65). (Rec. Doc. 69-3, Def. Exhibit A ¶ 37).[8] All of the foregoing pay rates well exceed $455 per week.

Plaintiffs argue, however, that even though they were told that they were receiving the fixed salaries recited above, Peoples Health actually paid them as if they were hourly employees. In support of this contention Plaintiffs point out that they were required to work at least 40 hours per week in order to be paid their weekly "salaried" rate, and they were docked when they worked less than 8 hours per day. If they did not work that full complement of hours then they were forced to use time from the appropriate leave category, such as vacation, personal, or sick. If an employee did not work a forty-hour week/eight-hour hour day and had no leave remaining, then his/her salary would be reduced in accordance with the time not worked.

The pertinent Department of Labor regulation, entitled Salary Basis, states:

An employee will be considered to be paid on a "salary basis" within the meaning of this part if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

29 C.F.R. § 541.602(a).

An exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked. *Id.*

---

[8] The record cites for Peoples Health's motion for summary judgment reference the motion for leave to file in excess of the page limit filed at document 69 because defense counsel delivered a courtesy hardcopy of this filing to the Court. After leave to file was granted, the motion for summary judgment was re-docketed as document number 71 but the Court agreed to use the original courtesy copy from the motion for leave filed at document 69.

§ 541.602(a)(1). But exempt employees need not be paid for any workweek in which they perform no work. *Id.*

The prohibition against deductions from pay (colloquially, the "no pay-docking rule") found in the general rule quoted above is subject to several exceptions. The relevant exception in light of Plaintiffs' allegations states:

> Deductions from pay may be made when an exempt employee is absent from work for one or more full days for personal reasons, other than sickness or disability. Thus, if an employee is absent for two full days to handle personal affairs, the employee's salaried status will not be affected if deductions are made from the salary for two full-day absences. ***However, if an exempt employee is absent for one and a half days for personal reasons, the employer can deduct only for the one full-day absence.***

*Id.* § 541.602(b)(1) (emphasis added).

When calculating the amount of a deduction from pay allowed under one of the exceptions provided in paragraph (b)(1), the employer may use the hourly or daily equivalent of the employee's full weekly salary or other amount proportional to the time actually missed by the employee. *Id.* § 541.602(c).

Notably, the foregoing regulations do not prohibit an employer from requiring its employees to track their attendance at work, and they do not prohibit an employer from requiring a forty-hour workweek from a salaried employee. Neither of these requirements are inimical to the salary basis rule.

Further, the regulations *do* allow for deductions from pay when a salaried employee does not work a forty-hour week so long as those deductions are not for absences *of less than a day*. And the FLSA does not prohibit an employer from requiring an employee to make up missed time for a partial day or otherwise use

appropriate leave when not working a full day. *See Cowart v. Ingalls Shipbldg., Inc.*, 213 F.3d 261, 265 (5th Cir. 2000).

Romero, Crowder, Breaux, and Perez have introduced no evidence to show that Peoples Health ever impermissibly reduced their pay for partial days missed at work.

Jones and Branch have submitted their payroll records, however, and they contend that those records establish instances where they were docked for partial days. For instance, Jones points out that his paycheck for June 3, 2016 and his paycheck for May 19, 2017 demonstrate that he was paid hourly because of the way that his bi-weekly check was reduced during those pay periods.

Having just recently tried Jones's related retaliation case against Peoples Health, the Court is astonished that Jones would rely on those two pay periods to support his claim that he was not a salaried employee. Jones ignores that the June 3, 2016 pay check included the pay period when he left work abruptly on May 18, 2016 without telling anyone and did not return for four months. (CA18-2755, FOF & COL at 2). Yet even though Jones left at 3:00 p.m. on that day, Jones was paid nonetheless for the entire day. (Rec. Doc. 105-1, Reply Exhibit 1 ¶ 11 & 1A). Peoples Health used time from Jones's leave bank in order to pay him for the full day on May 18, 2016 but the Department of Labor has long recognized that this practice does not violate the salary basis rule. (Rec. Doc. 105-2, Reply Exhibit 2, DOL Op. ltr.).

As for the May 19, 2017 paycheck, Peoples Health lawfully terminated Jones's employment on May 10, 2017. (CA18-2755, FOF & COL at 11). Yet Jones was paid for the entire day on May 10th without deduction. (Rec. Doc. 105-1, Reply Exhibit 1 ¶ 17 & 1B). Moreover, even if Peoples Health had docked Jones pay for a partial day on May

10, 2017, this one isolated incident on his last day of employment would not have resulted in the loss of the exemption. *See* 29 C.F.R. § 541.603(c).

Branch contends that her payroll records demonstrate that Peoples Health docked her pay for partial days not worked during three pay periods in 2014, one pay period in 2015, and one pay period in 2017. (Opposition Exhibit 23). Branch ignores that the August 1, 2014 paycheck that she complains about is based on a pay period when she worked <u>no</u> days whatsoever, full or partial. Peoples Health exhausted her leave bank due to Branch's absence from work and when that leave time ran out she was placed on FMLA unpaid leave for the uncovered time. (Rec. Doc. 105-1, Reply Exhibit 1 ¶ 21 & 1C). Branch's check was reduced for that pay period because Branch had insufficient paid time off to cover being absent from work for two weeks and the FLSA did not require Peoples Health to "pad" Branch's paid time off with extra hours in order to continue to pay her during two work weeks when she did not work at all. Branch's complaints about the other pay periods suffer from the same deficiencies. Branch was on FMLA unpaid leave for all of those pay periods.[9] (*Id.* ¶¶ 22, 23 & 1D-1G).

Although Jones and Branch ostensibly complain about deductions in pay that are not in whole day increments, what actually occurred is that they received pay for partial days when they otherwise would have been entitled to no pay at all because they were on unpaid FMLA leave. Peoples Health was not required to supplement Jones's and Branch's leave banks in order to give them full pay for days that fell during pay periods

---

[9] Branch's October 10, 2014 pay check does reflect payment for a partial day but that is because during her period of FMLA unpaid leave Branch was allowed to work from home at times and get paid for the hours that she worked. (Rec. Doc. 105-1, Reply Exhibit 1 ¶ 22 & 1E). This constituted a benefit to Branch during a time when she would have otherwise been entitled to receive no pay. It does not suggest that she was not a salaried employee.

when these two employees did not report to work at all and had elected to take FMLA unpaid leave.

Finally, Plaintiffs go to great lengths to argue that Peoples Health violated its own written timekeeping policy because it would not allow salaried employees to record time worked in excess of forty hours per week. Even if Peoples Health disregarded its written timekeeping policy—although the Court is not deciding that this did in fact occur—it does not follow that Plaintiffs were not paid on a salary basis.

In sum, Peoples Health has established by a preponderance of the evidence that each of the plaintiffs was compensated on a salary or fee basis at a rate of not less than $455 per week.

### 2) Primary Duty

For each of the Plaintiffs, Peoples Health must establish by a preponderance of the evidence that his/her primary job duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers.

According to the pertinent regulation,

To qualify for [administrative] exemption [], an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a).

The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

*Id.* § 541.700(b).

Plaintiffs do not dispute that their work consists solely of office or non-manual work but they dispute whether that work is directly related to the management or general business operations of Peoples Health or its customers.

To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers. The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

29 C.F.R. § 541.201(a).

Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

29 C.F.R. § 541.201(b).

Essentially, the "primary duty" element requires the fact-finder to analyze the facts to determine the employee's primary job duty and how that work directly relates to certain parts of the employer's business. *Dewan*, 858 F.3d at 334.

Peoples Health is a managed care company that offers an insurance product to individuals eligible for Medicare, known as a Medicare Advantage plan. Peoples Health administers the plan pursuant to a contract with the Center for Medicare and Medicaid Services. Peoples Health members receive healthcare and prescription drug benefits. When members receive covered healthcare services, Peoples Health is obligated to pay the providers for those services. When members fill prescriptions for drugs covered by its plan, Peoples Health is obligated to pay the pharmacy for those drugs and then determine its entitlement to compensation from CMS for that prescription drug event. To do business, Peoples Health must have a network of providers who are qualified and willing to provide healthcare services to its members. (Rec. Doc. 69-3, Def. Exhibit A ¶¶ 4-6).

This lawsuit includes employees from the Network Development Department (Jones, Crowder, Perez, Breaux, Branch) and the Pharmacy Department (Romero)—departments that had different roles within the Peoples Health organization. The jobs within these departments must be examined separately.

**Network Development Department ("NDD")**

At Peoples Health, the NDD, where Jones, Crowder, Perez, Breaux, and Branch worked, is responsible for establishing and maintaining a network of healthcare providers, including physicians and hospitals, as well as providers of ancillary services, such as transportation, home, healthcare, physical therapy, and the like. (*Id.* ¶ 14). The

NDD has two sub-departments: Provider Contracting and Operations. (*Id.* ¶ 16). At all times relevant, Janice Ortego was the senior vice president in charge of the entire NDD. (*Id.*). Anthony Bonck and Meg Courtney were both assistant vice presidents under Ortego, in charge of the Provider Contracting and Operations sub-departments, respectively. (*Id.*). Of the plaintiffs in the NDD group only Branch worked in Operations; the others worked in Provider Contracting.

### a.    Contracting Specialists

According to Peoples Health, the Contracting Specialists in the NDD (Jones, Crowder, Perez, Breaux) were responsible for contracting with physicians, hospital-based providers, and ancillary service providers who wished to join Peoples Health's network. (*Id.* ¶ 18a). Plaintiffs more appropriately characterize the responsibility as *recruiting* service providers to participate in Peoples Health's network of healthcare providers, and the Court does not discern from their opposition that they dispute that this was their "primary duty." (Rec. Doc. 85, Opposition at 15). Plaintiffs do not disagree that having a network of providers is critical to Peoples Health's business. (*Id.*). But while they believe that their role was one of the important aspects of Peoples Health's business, they dispute that their role directly related to the management or general business operations of Peoples Health.

Insofar as the Contracting Specialists are concerned, the Court has little trouble concluding that their primary duty, which was to promote to medical providers what Peoples Health had to offer and then recruit those providers to become participants in the network, directly related to the general business operations of Peoples Health. In fact, given Peoples Health's business model the Contracting Specialists' role was not

just directly related to general business operations it was *essential* to general business operations and the business model upon which Peoples Health is based.

The Contracting Specialists argue to the contrary that they did not work in any of the areas listed in 29 C.F.R. § 541.201(b) as being traditionally recognized as related to general business operations. That list is illustrative not exhaustive. And while the Contracting Specialists' jobs are functionally similar activities to some of the listed categories, *e.g.*, advertising, marketing, and research, the Court is persuaded that the primary duties of a Contracting Specialist are even more directly related to general business operations at Peoples Health than many of the generic functional support areas listed in the regulation.

The Contracting Specialists also try to avail themselves of the administering/producing dichotomy which recognizes that the administrative exemption applies when the employee is involved with "'administering the business affairs of the enterprise,' not with 'producing the commodity' of the business." *Dewan*, 858 F.3d at 337 (quoting *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990)). But it is undisputed that the Contract Specialists' job duties did not relate to producing Peoples Health's product, *i.e.*, an insurance policy. None of the plaintiffs wrote, produced, or sold insurance policies. Rather, their role was an important and vital part of supporting and servicing the general business operations of Peoples Health. The primary duties of the Contracting Specialists consisted wholly of exempt work.[10]

---

[10] The Court adds that Jones testified at length at his retaliation trial regarding the important role of a Contract Specialist at the Peoples Health organization. The Court found this part of Jones's testimony credible.

### b.    Operations Specialist

The Operations Specialists in NDD (Jennifer Branch) were responsible for working on various projects designed to improve operational processes and deficiencies. (Rec. Doc. 69-3, Def. Exhibit A ¶ 18c). Branch describes her primary job duty or duties as follows:

> The Operations Specialist position is a mix of recurring tasks and responsibilities to support assigned Network Development sub-departments with needs, as they arise. The scope of the position was generalized to: supporting and meeting with assigned Network Development sub-departments and their teams, reviewing current activity and assessing need, making recommendations to change current processes or creating new processes, creating strategies to remediate need, and executing approved strategies under the direction of the sub-department managers, the Network Development Operations Manager, and the Senior Vice President of Network Development. The Operations Specialist's duties are considered office or non-manual work.

(Rec. Doc. 69-23, Def. Exhibit K, Branch's response to Interrogatory no. 8).

At Branch's deposition she testified as follows when defense counsel asked her to provide a general sense of what she did in her job:

> I've just worked alongside of different teams within the Network Development Department. As needs arose, they would kind of send me in. I had a skill set I guess that was needed in that they needed a lot of documentation of things. And I could sit with people and listen to their overview of their position, how they did things, and look for opportunities. Typically, you know, I was challenged with: Here is the issue that we have identified, that Management has identified. Here are some ways we are looking to resolve it. So if you can kind of go in and get all of the details and summarize them in, you know, whatever capacity they were asking, you know, that would be great. So, I did that. Any data driven needs -- I had, I wouldn't say high functioning Excel skills, but comparatively to most of the people in the department, I was always the go-to person for Excel and things like that. I worked on Health Services Delivery tables. That was something that I did pretty much -- that was a continuum throughout my whole time at Peoples Health from the time that I was promoted to project coordinator, I believe. I don't think I did Health Service Delivery tables prior to that. A lot of time, you know, any time something new and shiny came into the environment, be it a decision that senior management made and

then it trickled down through the middle management and lower management, or whatever the hierarchies were at the time, it would create some sort of need. And I was just the point person to work with the departments and whoever those subject matter experts were in the department to figure out how we were going to meet the need. And it is hard to like even -- sometimes there was just so much, it is hard to say exactly. It was really anything and everything that came through. Not anything and everything, but a lot of things. They were so varied. But it was not --it was titled project manager, which, you know, looks good on a resumé, but there was never the ability to manage or direct anything.

(Rec. Do c. 69-19, Def. Exhibit G, Branch deposition at 31-33).[11]

One significant project indicative of Branch's duties was the re-write of the

Peoples Health's proprietary ProviderTrak software system. Branch was charged with

making the system more efficient and effective. (*Id.* at 121). This software system,

which was discussed at length during Jones's retaliation trial, is an essential part of the

Peoples Health's business as it relates to contracting with providers who want to join the

healthcare network.

As the Court appreciates Branch's position (as described more succinctly in her

opposition), she characterizes her primary duties as working closely with NDD staff in

thoroughly understanding new products and processes, establishing product timelines,

and ensuring that all activities are well coordinated and occur on schedule, as well as

providing logistic coordination for both continuing and new projects. (Rec .Doc. 85,

Opposition at 21; Pla. Exhibit 32). Branch's role was consultative; managers would

contact her on how to improve the processes or workflow in their departments.

---

[11] These duties were actually how Branch described the project manager role that she had before she became an Operations Specialist. But Branch testified that her role did not change along with her title. The job duties remained the same. (Rec. Doc. 69-19, Def. Exhibit G at 41).

According to Branch, her primary role was to be a liaison between multiple departments. (Opposition at 21).

The Court has little trouble concluding that Branch's primary duties were not only administrative in nature but that they directly related and assisted with the general business operations of Peoples Health, particularly those in the NDD. As with the Contract Specialists, Branch's only argument in opposition is the rather tepid assertion that her primary duties did not relate to any of the categories listed in 29 C.F.R. § 541.201(b) as being traditionally recognized as related to general business operations. Again, that list is not exhaustive, and Branch's job is functionally similar to some of the listed categories, *e.g.*, budgeting, quality control, personnel management, and compliance, that like Branch's job are targeted at improving processes and increasing efficiencies. Branch's primary duties consisted wholly of exempt work.

### Pharmacy Department ("PD")

Peoples Health's PD is responsible for, among other things, ensuring that Peoples Health pays to fill prescriptions for drugs covered by its plan and determining whether Peoples Health is entitled to compensation from CMS for those prescription drug events. (Rec. Doc. 69-3, Def. Exhibit A ¶ 19). Pharmacy Operations (Romero) was one of the sub-departments in PD. Sean Kennedy, Director of Pharmacy Operations, was in charge of that sub-department. (*Id.* ¶¶ 20-21).

The Pharmacy D Specialist position was newly created in 2012 and Romero was the first person ever to hold that position. (Rec. Doc. 69-21, Def. Exhibit I, Romero depo. at 106). Romero's primary responsibility in this position was to handle and resolve prescription drug events or PDEs. The purpose of the position was to have an employee

review claims, ensure compliance with CMS and claims processing guidelines as well as state and federal regulations, and to adjust claims where coordination of benefits, system edits and manual processing are being reviewed, as well as recoupment of claims paid from third parties. (Rec .Doc. 85-28, Pla. Exhibit 27, Job Desc.). In her opposition Romero characterizes her primary job duty as identifying payment errors or inaccuracies through various methods and preparing reports for management.[12] (Rec. Doc. 85, Opposition at 24).

The Court has little trouble concluding that Romero's primary duty/duties directly related to the general business operations of Peoples Health. In fact, the job was essential to Peoples Health's business operations because as Romero explained in her deposition, the PDEs that were her purview constituted about $3 million a week in benefits that Peoples Health was expected to cover. (Rec. Doc. 69-21, Def. Exhibit I, Romero depo. at 280). Discovering claim errors, resolving those errors with outside parties, ensuring that Peoples Health only paid what it actually owed for prescription coverage, and receiving reimbursement where appropriate—all of which were primary duties for Romero—were essential to Peoples Health's business operations. Romero testified that no one else at Peoples Health was qualified to do her job, (*id.* at 279), and this is likely why she was the most highly compensated of all the plaintiffs in this case.

Romero's argument that her primary duties did not relate to any of the categories listed in 29 C.F.R. § 541.201(b) as being traditionally recognized as related to general

---

[12] Romero also points out that in her discovery responses, when asked to identify her primary duty or duties she responded that "[t]he Pharmacy D Specialist's duties are a mix of daily, weekly, monthly, and 'as needed' tasks." (Rec. Doc. 85-27, Pla. Exhibit 26, Romero interrogatory no. 8). This catch-all statement does not, however, help to identify the *primary* duties of Romero's job.

business operations is especially weak because her job is functionally similar to several of the listed categories, *e.g.*, auditing, insurance, quality control, legal and regulatory compliance. Romero's primary duties consisted wholly of exempt work.

In sum, Peoples Health has established by a preponderance of the evidence that each of the plaintiffs' primary job duty(ies) is the performance of office or non-manual work directly related to the management or general business operations of the company.

### 3) Discretion and Judgment

For each of the Plaintiffs, Peoples Health must establish by a preponderance of the evidence that his/her primary job duty(ies) includes the exercise of discretion and independent judgment with respect to matters of significance.

The relevant Department of Labor regulation, entitled Discretion and Independent Judgment, states:

> ***To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance.*** In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

29 C.F.R. § 541.202(a) (emphasis added).

> The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: ***whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business***

> ***operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business***; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b) (emphasis added).

> The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, ***employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level.*** Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. ***The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment.*** For example, the policies formulated by the credit manager of a large corporation may be subject to review by higher company officials who may approve or disapprove these policies. The management consultant who has made a study of the operations of a business and who has drawn a proposed change in organization may have the plan reviewed or revised by superiors before it is submitted to the client.

29 C.F.R. § 541.202(c) (emphasis added).

Importantly, an employee need not exercise final decision-making authority to meet the regulation's standard. *Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 Fed. App'x 349, 354 (5th Cir. 2015) (unpublished) (citing 29 C.F.R. § 541.202(c); *Lott,* 203 F.3d at 331). Nevertheless, the exercise of discretion requires "more than the use of

skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e).

The Contracting Specialists exercised discretion and independent judgment in how to best approach and persuade potential providers to join the Peoples Health plan. After a potential provider was contacted, the Contracting Specialists determined whether a lead on a provider was worth pursuing tenaciously even if the provider initially declined to participate. These were matters of significance. It matters not to the analysis that the Contracting Specialists did not have the final authority to negotiate and execute a binding contract.[13]

Branch's deposition testimony regarding her primary job duties establishes that she exercised discretion and independent judgment with respect to matters of significance. Branch was a problem solver for management. Once a problem was identified, she was sent in to assess it and to use her judgment to make recommendations to solve it. It was Branch's job to make recommendations on how to meet the need identified and her role as a point person across all departments helped her to do this. Branch worked on her own, exercising discretion and judgment, to determine the best way to solve the problems brought to her. It matters not to the analysis that upper management retained the final decision making authority on whether to adopt Branch's proposed solutions.[14]

---

[13] The Court notes that Jones's position in this litigation regarding the absence of judgment and discretion with respect to matters of significance by the Contracting Specialists at Peoples Health is at odds with the way that Jones described the job during his retaliation trial.

[14] In fact, Branch's job duties are strikingly similar to those of a management consultant. The Department of Labor regulations generally recognize that position as satisfying the administrative exemption. *See* 29 C.F.R. § 541.203(e).

Finally, Romero acted autonomously and independently in her position to resolve PDE claims. Any suggestion to the contrary simply ignores Romero's deposition testimony about her primary job duties and the manner in which she carried them out. As explained above the PDE claims were matters of importance and significance to Peoples Health's business model. In fact, Romero worked so independently that even her own supervisor would have been incapable of stepping in to perform her job duties. Clearly, Romero exercised discretion and independent judgment to resolve claim anomalies and coordinate claim issues with providers, CMS, and other insurers. These were matters of significance to Peoples Health's business.[15]

In sum, Peoples Health has established by a preponderance of the evidence for each of the plaintiffs that his/her primary job duty(ies) includes the exercise of discretion and independent judgment with respect to matters of significance.

## III.   Conclusion

Peoples Health has established by a preponderance of the evidence that all of the plaintiffs are administratively exempt from the FLSA's overtime mandate. None of the evidence upon which the Court reaches this conclusion is in dispute. To the extent that the evidence could support more than one inference, the Court is persuaded that the same evidence, presented to the Court as trier of fact in a plenary trial, could not possibly lead to a different result. A trial is not necessary to resolve any issues of credibility or disputed issues of fact.

Peoples Health is entitled to judgment as a matter of law.

---

[15] In fact, Romero's job duties are strikingly similar to those of an insurance claims adjuster. The Department of Labor regulations generally recognize that position as satisfying the administrative exemption. *See* 29 C.F.R. § 541.203(a).

The alternative issues related to the statute of limitations applies and damages are moot.

Accordingly;

**IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 71)** filed by Defendant, New Orleans Regional Physician Hospital Organization, Inc. d/b/a Peoples Health Network is **GRANTED**. The complaint and all claims asserted by Bill Jones, Jennifer Branch, Laura Romero, Nan Nicole Crowder, Ivette Perez, and Melissa Breaux are **DISMISSED WITH PREJUDICE**.

November 26, 2019

_____
JUDGE JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE